M. Anderson Berry (SBN 262879)
Gregory Haroutunian (SBN 330263)
Brandon P. Jack (SBN 325584)
**CLAYEO C. ARNOLD**
**A PROFESSIONAL CORPORATION**
865 Howe Avenue
Sacramento, CA 95825
Telephone: (916) 239-4778
Fax: (916) 924-1829
*aberry@justice4you.com*
*gharoutunian@justice4you.com*
*bjack@justice4you.com*

[Additional Counsel on following page]

*Attorneys for Plaintiff*
*STEVEN HILL*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEVEN HILL, Derivatively on Behalf of APPLE INC., <br><br> Plaintiff, <br><br> v. <br><br> TIMOTHY D. COOK, LUCA MAESTRI, KEVAN PAREKH, ARTHUR D. LEVINSON, WANDA AUSTIN, ALEX GORSKY, ANDREA JUNG, MONICA LOZANO, RONALD D. SUGAR, and SUSAN L. WAGNER, <br><br> Defendants, <br><br> and, <br><br> APPLE, INC., <br><br> Nominal Defendant. | CASE NO. 3:25-cv-5364 <br><br> **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** <br><br> **<u>JURY TRIAL DEMANDED</u>** |

///

///

///

///

Thomas J. McKenna*
*tjmckenna@gme-law.com*
Gregory M. Egleston*
*gegleston@gme-law.com*
**GAINEY McKENNA & EGLESTON**
260 Madison Avenue, 22nd Floor
New York, NY 10016
Tel.: (212) 983-1300
Fax: (212) 983-0383

*Pro Hac Vice Forthcoming*

*Counsel for Plaintiff*

Plaintiff Steven Hill ("Plaintiff"), by and through his undersigned counsel, derivatively on behalf of Apple, Inc., ("Apple" or the "Company"), submits this Verified Shareholder Derivative Complaint (the "Complaint"). Plaintiff's allegations are based upon his personal knowledge as to himself and his own acts, and upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, including a review of publicly available information, including filings by the Company with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action brought in the right, and for the benefit, of the Company against certain of its officers and directors seeking to remedy the Individual Defendants' (defined below) violations of state and federal law that have caused substantial harm to the Company.

2.      Apple is a multinational technology company that engages primarily in the businesses of smart-device and computer design and manufacturing, entertainment and artificial intelligence ("AI"). Apple's software includes a rudimentary digital personal assistant called "Siri," which the Company first introduced in October 2011.

3.      Apple's highest revenue product is the iPhone. The Company typically introduces a new line of iPhones each year in the fall. Most recently, Apple introduced the iPhone 16 in October 2024.

4.      In recent years, several of Apple's competitors have developed and/or launched advanced AI capabilities based on large language models. For example, Google and Microsoft have each launched generative-AI chatbots respectively referred to as Gemini and Copilot. In addition, Amazon has announced that it was introducing Alexa+, a conversational, generative-AI version of its own virtual assistant technology. Accordingly, Apple has felt pressure to introduce AI-based capabilities on its iPhones, and in particular to introduce advanced AI-based Siri features.

5.      In June 2024, Apple announced advanced AI-based Siri features at its Worldwide Developer Conference ("WWDC") (the "2024 WWDC")—an event designed to showcase the

Company's new software and technologies—as the primary reason for consumers to purchase iPhone 16 devices. Specifically, the Company introduced Apple Intelligence, the "personal intelligence system that combines the power of generative models with users' personal context — at the core of iPhone, iPad, and Mac to deliver intelligence that's incredibly useful and relevant." Apple stated that Apple Intelligence, among other things, will make Siri "more deeply integrated into the system experience," and "[w]ith richer language-understanding capabilities, Siri is more natural, more contextually relevant, and more personal, with the ability to simplify and accelerate everyday tasks. It can follow along if users stumble over words and maintain context from one request to the next." However, unbeknownst to investors, Apple lacked a functional prototype of these advanced AI-based Siri features at the time of the 2024 WWDC and had no reasonable basis to believe it could deliver the product it was advertising within the iPhone 16 product cycle, if ever.

6.    The Individual Defendants made materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants made false and/or misleading statements and/or failed to disclose that: (i) Apple misstated the time it would take to integrate the advanced AI-based Siri features into its devices; (ii) accordingly, it was highly unlikely that these features would be available for the iPhone 16; (iii) the lack of such advanced AI-based features would hurt iPhone 16 sales; (iv) as a result, Apple's business and/or financial prospects were overstated; and (v) as a result, the Company's public statements were materially false and misleading at all relevant times.

7.    On March 7, 2025, Apple announced that it was indefinitely delaying promised updates to its Siri digital assistant. Specifically, multiple news outlets quoted an Apple spokeswoman as stating that certain features initially announced in June 2024, including Siri's ability to tap into a user's personal information to answer queries and have more precise control over apps, were "tak[ing] [] longer [to deliver] than [the Company] thought" and will now be released sometime in "the coming year." That same day, this statement was published by John Gruber, the writer and producer of the technology-focused weblog Daring Fireball, who criticized Apple's promised AI-based Siri features as having been "vaporware" (imaginary) and Apple's

1    2024 WWDC advertising as being, in retrospect, merely a "concept video." In addition, Apple

2    stopped running advertisements promoting the advanced AI-based Siri features and pulled those

3    advertisements from its website and YouTube account.

4         8.    Then, on March 12, 2025, Morgan Stanley published a report in which analyst Erik

5    Woodring lowered his price target on Apple from $275 to $252, asserting that the delay in

6    introducing advanced Siri features would impact iPhone upgrade cycles throughout 2025 and

7    2026. Woodring presented evidence that roughly 50% of iPhone owners who did not upgrade to

8    the iPhone 16 attributed their decision to such delays.

9         9.    Then, on April 3, 2025, the Wall Street Journal published an article entitled "Apple

10   and Amazon Promised Us Revolutionary AI. We're Still Waiting." The Wall Street Journal stated,

11   in relevant part, that "[w]ith 'more personal' Siri [. . .], the tech giant[] marketed features [it] ha[s]

12   yet to deliver," and suggested that while "this is challenging technology and the cost of getting it

13   wrong is devastatingly high, especially for [a] company[y] like Apple [. . .] that must build trust

14   with customers," "the same responsibility applies to marketing: They shouldn't announce products

15   until they're sure they can deliver them."

16        10.   Finally, on June 9, Apple hosted its WWDC for 2025 (the "2025 WWDC"), almost

17   one year to the day after first announcing the suite of supposedly forthcoming Apple Intelligence

18   features at the 2024 WWDC. Conspicuously, the Company failed to announce any new updates

19   regarding advanced Siri features. Analysts and media outlets variously described the WWDC as

20   "underwhelming" and "disappointing," with CNN commenting that "it's unlikely that any of the

21   announcements made at Monday's event will change the perception that Apple is behind its

22   competitors in AI."

23        11.   Apple's own team has admitted that the advanced AI-based Siri features that it had

24   advertised as reasons to purchase iPhone 16 Devices had not been developed by the time of the

25   2024 WWDC, or at any other time. For example, at an all-hands meeting for the Siri division

26   following the announcement of the delays, Robby Walker ("Walker"), senior director responsible

27   for Siri, stated that Apple had publicly promoted the technology "before it was ready." Walker

28   called the delays to the key features "ugly and embarrassing" and stated, "[t]his was not one of

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

these situations where we get to show people our plan after it's done. We showed people before." He also noted that "to make matters worse," Apple's marketing communications department wanted to promote the enhancements, and, despite not being ready, they were included in a series of marketing campaigns and TV commercials. Apple touted the features as a "key selling point" of the iPhone 16 line, which otherwise lacked major changes.

12.    In an article entitled "Apple Delays Siri Upgrade Indefinitely as AI Concerns Escalate," Bloomberg stated that Apple has pushed the expected release of these features until at least the next full version of iOS, iOS 19, which is not expected to be released until September 2025 at the earliest. Moreover, while Apple is aiming to include these features in iOS 19, Walker has stated that that "doesn't mean that we're shipping then," and Apple has "other commitments across Apple to other projects." In fact, there is no guarantee that the advanced AI-based Siri features Apple promised will ever be available. Indeed, Apple's software chief Craig Federighi and other Apple executives have "voiced strong concerns internally that the features didn't work properly—or as advertised—in their personal testing," and some within Apple's AI division "believe that work on the features could be scrapped altogether, and that Apple may have to rebuild the functions from scratch."

13.    As a result of the Individual Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, the Company has suffered damage.

## JURISDICTION

14.    This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 as Plaintiff's claims raise a federal question under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") (15 U.S.C. §§ 78j(b), 78t(a) and 78t-1), SEC Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder.  This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. §1367(a).  This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

15.    This Court has personal jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this

District or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the courts of this District permissible under traditional notions of fair play and substantial justice.

16.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because: (i) the Company maintains its principal place of business in this District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the Individual Defendants' primary participation in the wrongful acts detailed herein and aiding and abetting and conspiracy in violation of fiduciary duties owed to the Company, occurred in this District; and (iv) the Individual Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

17.    In connection with the acts, transactions, and conduct alleged herein, the Individual Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## THE PARTIES

**Plaintiff**

18.    ***Plaintiff*** is, and was at relevant times, a shareholder of the Company. Plaintiff will fairly and adequately represent the interests of the shareholders in enforcing the rights of the corporation.

**Nominal Defendant**

19.    ***Nominal Defendant Apple*** is a California corporation with principal executive offices located at One Apple Park Way, Cupertino, California. Apple's common stock trades in an efficient market on the Nasdaq Global Select Market ("NASDAQ") under the ticker symbol "AAPL".

**Director Defendants**

20.    ***Defendant Timothy D. Cook*** ("Cook") has served as Apple's Chief Executive Officer at all relevant times.

21.    **Defendant Arthur D. Levinson** ("Levinson") has served as a director of the Company at all relevant times. He also serves as Chair of the Board and as a member of the People and Compensation Committee.

22.    **Defendant Wanda Austin** ("Austin") has served as a director of the Company at all relevant times. She also serves as a member of the Audit and Finance Committee.

23.    **Defendant Alex Gorsky** ("Gorsky") has served as a director of the Company at all relevant times. He also serves as a member of the People and Compensation Committee and the Nominating and Corporate Governance Committee.

24.    **Defendant Andrea Jung** ("Jung") has served as a director of the Company at all relevant times. She also serves as a Chair of the People and Compensation Committee and a member of the Nominating and Corporate Governance Committee.

25.    **Defendant Monica Lozano** ("Lozano") has served as a director of the Company at all relevant times. She also serves as a member of the Audit and Finance Committee.

26.    **Defendant Ronald D. Sugar** ("Sugar") has served as a director of the Company at all relevant times. He also serves as Chair of the Audit and Finance Committee.

27.    **Defendant Susan L. Wagner** ("Wagner") has served as a director of the Company at all relevant times. She also serves as Chair of the Nominating and Corporate Governance and as a member of the Audit and Finance Committee.

28.    Defendants Cook, Levinson, Austin, Gorsky, Jung, Lozano, Sugar, and Wagner are collectively referred to as the "Director Defendants".

**Officer Defendants**

29.    **Defendant Luca Maestri** ("Maestri") served as Apple's Chief Financial Officer ("CFO") until January 2025.

30.    **Defendant Kevan Parekh** ("Parekh") has served as Apple's CFO since January 2025.

31.    Defendants Maestri and Parekh along with Defendant Cook are collectively referred to herein as the "Officer Defendants."

///

1       32.    The Director Defendants and Officer Defendants are collectively referred to herein

2   as the "Individual Defendants."

3   **BACKGROUND**

4       33.    Apple is a multinational technology company that engages primarily in the

5   businesses of smart-device and computer design and manufacturing, entertainment and AI.

6   **MATERIALLY FALSE AND MISLEADING STATEMENTS**

7       34.    On June 10, 2024, the Company issued a press release entitled "Introducing Apple

8   Intelligence, the personal intelligence system that puts powerful generative models at the core of

9   iPhone, iPad, and Mac." The press release touted upgrades to its Siri digital assistant in connection

10  with the 2024 WWDC, stating, in relevant part:

11      Apple today introduced Apple Intelligence, the personal intelligence system for

12  iPhone, iPad, and Mac that combines the power of generative models with personal context to deliver intelligence that's incredibly useful and relevant. Apple

13  Intelligence is deeply integrated into iOS 18, iPadOS 18, and macOS Sequoia. It harnesses the power of Apple silicon to understand and create language and images,

14  take action across apps, and draw from personal context to simplify and accelerate everyday tasks. With Private Cloud Compute, Apple sets a new standard for privacy

15  in AI, with the ability to flex and scale computational capacity between on-device processing and larger, server-based models that run on dedicated Apple silicon

16  servers.

17      "We're thrilled to introduce a new chapter in Apple innovation. Apple Intelligence will transform what users can do with our products — and what our products can

18  do for our users," said [Defendant] Cook[.] "Our unique approach combines generative AI with a user's personal context to deliver truly helpful intelligence.

19  And it can access that information in a completely private and secure way to help users do the things that matter most to them. This is AI as only Apple can deliver

20  it, and we can't wait for users to experience what it can do."

21  ***

22  **Siri Enters a New Era**

23  ***Powered by Apple Intelligence, Siri becomes more deeply integrated into the system experience. With richer language-understanding capabilities, Siri is more

24  natural, more contextually relevant, and more personal, with the ability to simplify and accelerate everyday tasks. It can follow along if users stumble over

25  words and maintain context from one request to the next***. Additionally, users can type to Siri, and switch between text and voice to communicate with Siri in

26  whatever way feels right for the moment. Siri also has a brand-new design with an elegant glowing light that wraps around the edge of the screen when Siri is active.

27

28  ///

- 9 -
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT





\*\*\*

Siri can now give users device support everywhere they go, and answer thousands of questions about how to do something on iPhone, iPad, and Mac. Users can learn everything from how to schedule an email in the Mail app, to how to switch from Light to Dark Mode.

***With onscreen awareness, Siri will be able to understand and take action with users' content in more apps over time***. For example, if a friend texts a user their new address in Messages, the receiver can say, "Add this address to his contact card."



With onscreen awareness, Siri makes it easy to perform an action related to information on the screen, such as adding an address received in Messages to a friend's contact card.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

**With Apple Intelligence, Siri will be able to take hundreds of new actions in and across Apple and third-party apps**. For example, a user could say, "Bring up that article about cicadas from my Reading List," or "Send the photos from the barbecue on Saturday to Malia," and Siri will take care of it.



*Siri will be able to deliver intelligence that's tailored to the user and their on-device information*. For example, a user can say, "Play that podcast that Jamie recommended," and Siri will locate and play the episode, without the user having to remember whether it was mentioned in a text or an email. Or they could ask, "When is Mom's flight landing?" and Siri will find the flight details and cross-reference them with real-time flight tracking to give an arrival time.[1]

35.    On August 1, 2024, Apple issued a press release announcing the Company's Q3 2024 results. The press release stated, in relevant part:

"Today Apple is reporting a new June quarter revenue record of $85.8 billion, up 5 percent from a year ago," said [Defendant] Cook[.] "***During the quarter, we were excited to announce incredible updates to our software platforms at our Worldwide Developers Conference, including Apple Intelligence, a breakthrough personal intelligence system that puts powerful, private generative AI models at the core of iPhone, iPad, and Mac***. We very much look forward to sharing these tools with our users, and we continue to invest significantly in the innovations that will enrich our customers' lives, while leading with the values that drive our work."

///

///

---

[1]    All emphasis included herein is added unless otherwise indicated.

36.     That same day, Apple hosted an earnings call with investors and analysts to discuss the Company's Q3 2024 results (the "Q3 2024 Earnings Call"). During the scripted portion of the Q3 2024 Earnings Call, Defendant Cook stated, in relevant part:

> At our Worldwide Developers Conference, we were thrilled to unveil game-changing updates across our platforms, including Apple Intelligence. Apple Intelligence builds on years of innovation and investment in AI and Machine Learning. It will transform how users interact with technology, from writing tools to help you express yourself, to image playground, which gives you the ability to create fun images and communicate in new ways, to powerful tools for summarizing and prioritizing notifications.
>
> **_Siri also becomes more natural, more useful, and more personal than ever_**. Apple Intelligence is built on a foundation of privacy, both through on-device processing that does not collect users' data and through private cloud compute, a groundbreaking new approach to using the cloud, while protecting users' information powered by Apple silicon. We are also integrating ChatGPT into experiences within iPhone, Mac, and iPad, enabling users to draw on a broad base of world knowledge. We are very excited about Apple Intelligence and we remain incredibly optimistic about the extraordinary possibilities of AI and its ability to enrich customers' lives. We will continue to make significant investments in this technology and dedicate ourselves to the innovation that will unlock its full potential.

37.     Further, during the Q&A portion of the Q3 2024 Earnings Call, when asked to discuss what the Company is expecting from the "promotional environment" over the next several years, Defendant Cook responded, in relevant part, that "[w]e are very excited about Apple Intelligence and what it brings, **_and it is another compelling reason for an upgrade._**"

38.     On September 9, 2024, Apple issued a press release entitled "Apple Intelligence comes to iPhone, iPad, and Mac starting next month." The press release stated, in relevant part:

> Helpful Writing Tools, Mail and notifications summaries, **_a more natural and flexible Siri_**, the Clean Up tool in Photos, and many more Apple Intelligence features roll out in the U.S., with additional English-language support coming later this year[.]
>
> ***
>
> Today, Apple announced that Apple Intelligence, **_the personal intelligence system that combines the power of generative models with personal context to deliver intelligence that is incredibly useful and relevant_**, will start rolling out next month with iOS 18.1, iPadOS 18.1, and macOS Sequoia 15.1, with more features launching in the coming months. In addition, Apple introduced the new iPhone 16 lineup, built from the ground up for Apple Intelligence and featuring the faster, more efficient A18 and A18 Pro chips — making these the most advanced and capable iPhone models ever.

///

\*\*\*

*Siri becomes more natural, flexible, and deeply integrated into the system experience*. It has a brand-new design with an elegant glowing light that wraps around the edge of the screen when active on iPhone, iPad, or CarPlay. On Mac, a user can place Siri anywhere on their desktop to access it easily as they work. Users can type to Siri at any time on iPhone, iPad, and Mac, and can switch fluidly between text and voice as they use Siri to accelerate everyday tasks. *With richer language-understanding capabilities, Siri can follow along when users stumble over their words and can maintain context from one request to the next*. In addition, with Siri's extensive product knowledge, it can now answer thousands of questions about the features and settings of Apple devices. Users can learn everything from how to take a screen recording to how to easily share a Wi-Fi password.

\*\*\*

**Many More Features to Come**

More Apple Intelligence features will roll out later this year and in the months following. Image Playground will allow users to create playful images in moments. Image Wand will make notes more visually engaging by turning rough sketches into delightful images. When a user circles an empty space, Image Wand will create an image using context from the surrounding area. Emoji will be taken to an entirely new level with the ability to create original Genmoji by simply typing a description, or by selecting a photo of a friend or family member. *Siri will be even more capable, with the ability to draw on a user's personal context to deliver intelligence that is tailored to them. It will also gain onscreen awareness, as well as take hundreds of new actions in and across Apple and third-party apps*. Plus, users have the option to access ChatGPT's broad world knowledge from several experiences within iOS 18, iPadOS 18, and macOS Sequoia, allowing users to access its expertise — as well as its image- and document-understanding capabilities — without needing to jump between tools.

39.     On September 16, 2024, Apple issued a press release entitled "iOS 18 is available today, making iPhone more personal and capable than ever." The press release stated, in relevant part:

**The First Set of Apple Intelligence Features Available Next Month**

Apple Intelligence is deeply integrated into iOS 18, harnessing the power of Apple silicon to understand and create language and images, take action across apps, and draw from personal context to simplify and accelerate everyday tasks — all while protecting users' privacy and security. The first set of Apple Intelligence features will be available next month, delivering experiences that are delightful, intuitive, easy to use, and specially designed to help users do the things that matter most to them.

\*\*\*

*Siri becomes more natural, flexible, and deeply integrated into the system experience*. It has a brand-new design with an elegant glowing light that wraps around the edge of the screen when active on iPhone. Users can type to Siri at any time on iPhone, and can switch fluidly between text and voice as they use Siri to

accelerate everyday tasks. ***With richer language-understanding capabilities, Siri can follow along when users stumble over their words and can maintain context from one request to the next. In addition, with Siri's extensive product knowledge, it can now answer thousands of questions about the features and settings of Apple devices***.

40.    In September 2024, Apple also began running a television advertisement featuring actress Bella Ramsey which purported to showcase Siri's AI capabilities, including personal context and on-screen awareness to help schedule appointments, and labeled the advanced AI-based Siri as "more personal":



41.    On October 28, 2024, Apple issued a press release entitled "Apple Intelligence is available today on iPhone, iPad, and Mac." The press release stated, in relevant part:

> "Apple Intelligence introduces a new era for iPhone, iPad, and Mac, delivering brand-new experiences and tools that will transform what our users can accomplish," said [Defendant] Cook[.] "Apple Intelligence builds on years of innovation in AI and machine learning to put Apple's generative models at the core of our devices, giving our users a personal intelligence system that is easy to use — all while protecting their privacy. Apple Intelligence is generative AI in a way that only Apple can deliver, and we're incredibly excited about its ability to enrich our users' lives."
>
> ***
>
> **Many More Features to Come**
>
> New Apple Intelligence features will be available in December, with additional capabilities rolling out in the coming months. Apple Intelligence will add new ways for users to express themselves visually. Emoji will be taken to an entirely new level with the ability to create original Genmoji by simply typing a description, and can also be personalized using a photo of a friend or family member. Image

Playground will allow users to create playful images in moments. Image Wand will make notes more visually engaging by turning rough sketches into delightful images. When a user circles an empty space, Image Wand will create an image using context from the surrounding area.

\*\*\*

In December, Writing Tools will get even more powerful with the ability for users to describe a specific change they want to apply to their text, like making a dinner party invite read like a poem, or adding more dynamic action words to a résumé. And users will have the option to access ChatGPT's broad world knowledge within Writing Tools and Siri, allowing them to benefit from its image- and document-understanding capabilities without needing to jump between tools.

Also coming in December, a new visual intelligence experience will build on Appl Intelligence and help users learn about objects and places instantly, thanks to the new Camera Control on the iPhone 16 lineup.2 Users will be able to pull up details about a restaurant in front of them and interact with information — for example, translating text from one language to another.3 Camera Control will also serve as a gateway to third-party tools with specific domain expertise, like when users want to search Google for where they can buy an item, or benefit from ChatGPT's problem-solving skills. Users are in control of when third-party tools are used and what information is shared.

***In the months to come, Priority Notifications will surface what's most important, and Siri will become even more capable, with the ability to draw on a user's personal context to deliver intelligence that's tailored to them. Siri will also gain onscreen awareness, as well as be able to take hundreds of new actions in and across Apple and third-party apps***.

42.    On October 31, 2024, Apple issued a press release announcing the Company's Q4 2024 results. The press release stated, in relevant part:

"Today Apple is reporting a new September quarter revenue record of $94.9 billion, up 6 percent from a year ago," said [Defendant] Cook[.] "During the quarter, we were excited to announce our best products yet, with the all-new iPhone 16 lineup, Apple Watch Series 10, AirPods 4, and remarkable features for hearing health and sleep apnea detection. ***And this week, we released our first set of features for Apple Intelligence, which sets a new standard for privacy in AI and supercharges our lineup heading into the holiday season***."

43.    That same day, Apple hosted an earnings call with investors and analysts to discuss the Company's Q4 2024 results (the "Q4 024 Earnings Call"). During the scripted portion of the Q4 2024 Earnings Call, Defendant Cook stated, in relevant part:

Apple Intelligence marks the beginning of a new chapter for Apple innovation and redefines privacy and AI by extending our groundbreaking approach to privacy into the cloud with Private Cloud Compute. Earlier this week, we made the first set of Apple Intelligence features available in US English for iPhone, iPad, and Mac users, with systemwide Writing Tools that help you refine your writing, ***a more natural and conversational Siri***, a more intelligent Photos app, including the

ability to create movies simply by typing a description, and new ways to prioritize and stay in the moment with notification summaries and priority messages. And we look forward to additional intelligence features in December, with even more powerful Writing Tools, a new visual intelligence experience that builds on Apple Intelligence, and ChatGPT integration, as well as localized English in several countries, including the UK, Australia, and Canada. These features have already been provided to developers and we're getting great feedback. ***More features will be rolling out in the coming months, as well as support for more languages, and this is just the beginning***.

44. Further, during the Q&A portion of the Q4 2024 Earnings Call, when asked to discuss the impact Apple Intelligence may have on iPhone 16 sales, Defendant Cook responded, in relevant part, "[o]n Apple Intelligence, we believe it's a compelling upgrade reason. And we'll -- but we just launched it three days ago and so what we've got now from a data point point of view is the number I just referenced that 18.1 has twice the adoption rate of 17.1. So, that clearly shows a level of interest out there."

45. On December 11, 2024, Apple issued a press release entitled "Apple Intelligence now features Image Playground, Genmoji, Writing Tools enhancements, seamless support for ChatGPT, and visual intelligence." The press release stated, in relevant part:

Even More Capabilities Coming Soon

*Additional Apple Intelligence capabilities will be available in the months to come. Siri will be even more capable, with the ability to draw on a user's personal context to deliver intelligence that's tailored to them.* Siri will also gain onscreen awareness, and will be able to take hundreds of new actions in and across Apple and third-party apps. Priority Notifications will also surface what's most important. In addition, users will be able to create images in Image Playground in a Sketch style, an academic and highly detailed style that uses a vibrant color palette combined with technical lines to produce realistic drawings.

46. On January 30, 2025, Apple issued a press release announcing the Company's Q1 2025 results. The press release stated, in relevant part:

"Today Apple is reporting our best quarter ever, with revenue of $124.3 billion, up 4 percent from a year ago," said [Defendant] Cook[.] "We were thrilled to bring customers our best-ever lineup of products and services during the holiday season. ***Through the power of Apple silicon, we're unlocking new possibilities for our users with Apple Intelligence, which makes apps and experiences even better and more personal. And we're excited that Apple Intelligence will be available in even more languages this April.***"

///

///

47.     That same day, Apple hosted an earnings call with investors and analysts to discuss the Company's Q1 2025 results (the "Q1 2025 Earnings Call"). During the scripted portion of the Q1 2025 Earnings Call, Defendant Cook stated, in relevant part:

> We introduced visual intelligence with camera control to help users instantly learn about their surroundings. Users can also seamlessly access chat GPT across iOS, iPadOS and MacOS. And we were excited to recently begin our international expansion with Apple Intelligence now available in Australia, Canada, New Zealand, South Africa, and the U.K. We're working hard to take Apple Intelligence even further. In April, we're bringing Apple Intelligence to more languages, including French, German, Italian, Portuguese, Spanish, Japanese, Korean, and simplified Chinese, as well as localized English to Singapore and India. ***And we'll continue to roll out more features in the future, including an even more capable Siri***.
>
> Apple Intelligence builds on years of innovations we've made across hardware and software to transform how users experience our products. Apple Intelligence also empowers users by delivering personal context that's relevant to them. And importantly, Apple Intelligence is a breakthrough for privacy and AI with innovations like Private Cloud Compute, which extends the industry-leading security and privacy of Apple devices into the cloud. Apple Intelligence opens up an exciting new frontier and is already elevating experiences across iPhone, iPad, and Mac. We're going to keep investing in innovation and in transformative tools that help users in their everyday lives.

48.     Further, during the Q&A portion of the Q1 2025 Earnings Call, when asked "[d]o you guys see the upgraded series expected in April as something that will, let's say, be the killer application among the suite of features that you have announced in Apple Intelligence?", Defendant Cook responded, in relevant part, "I think the killer feature is different for different people. But I think for most, they're going to find that they're going to use many of the features every day. ***And certainly, one of those is the -- is Siri, and that will be coming over the next several months.***"

49.     The above-referenced statements were materially false and misleading because the Individual Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the Individual Defendants made false and/or misleading statements and/or failed to disclose that: (i) Apple misstated the time it would take to integrate the advanced AI-based Siri features into its devices; (ii) accordingly, it was highly unlikely that these features would be available for the iPhone 16; (iii) the lack of such advanced AI-based features would hurt iPhone 16 sales; (iv) as a

result, Apple's business and/or financial prospects were overstated; and (v) as a result, the Company's public statements were materially false and misleading at all relevant times.

**THE TRUTH EMERGES**

50.     On March 7, 2025, Apple announced that it was indefinitely delaying promised updates to its Siri digital assistant. Specifically, multiple news outlets quoted an Apple spokeswoman was as stating:

> Siri helps our users find what they need and get things done quickly, and in just the past six months, we've made Siri more conversational, introduced new features like type to Siri and product knowledge, and added an integration with ChatGPT. We've also been working on a more personalized Siri, giving it more awareness of your personal context, as well as the ability to take action for you within and across your apps. ***It's going to take us longer than we thought to deliver on these features and we anticipate rolling them out in the coming year***.

51.     That same day, this statement was published by John Gruber, the writer and producer of the technology-focused weblog Daring Fireball, who criticized Apple's promised AI-based Siri features as having been "vaporware" (imaginary) and Apple's WWDC advertising as being, in retrospect, merely a "concept video." In addition, Apple stopped running advertisements promoting the advanced AI-based Siri features and pulled those advertisements from its website and YouTube account.

52.     On this news, Apple's stock price fell $11.59 per share, or 4.85%, to close at $227.48 per share on March 10, 2025.

53.     Then, on March 12, 2025, Morgan Stanley published a report entitled "Fewer (A)pple (I)ntelligence Catalysts Temper Upgrade Cycle," in which analyst Erik Woodring lowered his price target on Apple from $275 to $252. The report also stated, in relevant part:

> ***The delayed rollout of a more advanced Siri means Apple will have fewer features to accelerate iPhone upgrade rates in FY26, and as a result, we reduce our CY25/CY26 iPhone shipments 1-5%, to 230M and 243M, respectively.*** We also incorporate a degree of tariff headwinds in CY25. PT falls to $252.
>
> **Key Takeaways**
>
> ***The postponement of an advanced Siri integrated into Apple Intelligence is likely to temper N12M iPhone upgrade rates vs. our prior expectations.***
>
> ***As a result, we are reducing our CY25 and CY26 iPhone shipments to 230M (flat Y/Y) and 243M (+6% Y/Y), respectively, implying a flatter replacement cycle curve.***

***

**With fewer "shots on goal" to improve iPhone upgrade rates next cycle, we see a more gradual path to shortening of iPhone replacement cycles.** To date, our thesis has been that the combination of (1) more advanced AI features, (2) broader global distribution of these features, (3) upgraded iPhone hardware, and (4) a new iPhone 17 form factor would catalyze an iPhone upgrade cycle starting in FY26 and support share outperformance over the next 12 months. ***However, recent reports that the rollout of a more-advanced Siri has been delayed - which was confirmed by Apple - dampen those prospects, as "an upgraded Siri personal assistant" is the #1 AI feature prospective iPhone upgraders are interested in when upgrading.*** As a result, we are materially reducing our iPhone forecast and now model 230M shipments in CY25 (flat Y/Y) and 243M shipments in CY26 (+6% Y/Y). At the same time, we are incorporating incremental cost headwinds from China tariffs, as while we believe Apple is taking actions to help mitigate tariffs, it's unlikely that Apple can fully offset this cost without broad tariff exemptions, which have not been granted. Net net, this leaves us with just $8 of earnings power in FY26 (vs. $8.52 previously), which on a 30x target multiple (down from 32x previously), drives our new $252 price target (vs. $275 previously).

***

**What's changed? Is a delayed Siri upgrade that important to our iPhone forecast? *Yes, and our November '24 AlphaWise Smartphone survey results validate this point.*** "Access to Advanced AI Features" was listed as a top 5 driver of smartphone upgrades for the first time, and an "Upgraded Siri digital assistant" was the Apple Intelligence feature prospective new model iPhone buyers (globally) were most interested in[.] ***Furthermore, ~50% of iPhone owners that didn't upgrade to an iPhone 16 acknowledged that the delayed Apple Intelligence rollout had an impact on their decision not to upgrade[.] Given our prior iPhone forecast assumed the iOS18.4 launch in April '25 would integrate a more advanced Siri alongside broader Apple Intelligence language support and accelerate upgrade rates this fall, we believe it is necessary to lower our upgrade rate assumption, and FY26 shipment forecast, as a more advanced Siri is unlikely to be available until after the iPhone 17 launch.*** That's not to say other factors cannot support iPhone growth in FY26 (more on this below), but without a "killer AI app" in market ahead of the iPhone 17 launch, we don't see AI feature contributing to accelerating upgrade rates as meaningfully as we did previously.

54.    On this news, Apple's stock price fell $11.16 per share, or 5.05%, over the following two trading sessions, to close at $209.68 per share on March 13, 2025.

55.    Then, on April 3, 2025, the Wall Street Journal published an article entitled "Apple and Amazon Promised Us Revolutionary AI. We're Still Waiting." The Wall Street Journal article stated, in relevant part:

With 'more personal' Siri [. . .], the tech giant[] ***marketed features [it has] yet to deliver***[.]

///

- 19 -

\*\*\*

In March, the iPhone maker said that some of its AI Siri enhancements—originally showcased last June as part of iOS 18, which launched in September—were taking longer to deliver than expected. "We anticipate rolling them out in the coming year," an Apple spokeswoman said.

Apple ran an iPhone 16 Pro ad that highlighted how this "more personal Siri" could scan previous calendar appointments to help recall the name of someone you once met at a coffee shop. The company stopped running the ad, and even made it vanish from its YouTube account.



In an ad featuring actress Bella Ramsey, Apple showed how Siri could look up contextual information. Apple has since stopped running the ad.

***Sure, these tech giants have made different promises, but the theme is the same: We have been misled***.

I understand that this is challenging technology and the cost of getting it wrong is devastatingly high, especially for companies like Apple and Amazon that must build trust with customers. ***But the same responsibility applies to marketing: They shouldn't announce products until they're sure they can deliver them***.

**Pressure to get it out**

I don't need to tell you about the AI mania that has gripped the stock market. If you're a tech company and you're not shouting "AI! AI! AI!" to assure investors and the public you're on it, you might as well go look for the BlackBerry executives' support group.

\*\*\*

Apple's response? Apple Intelligence. Some analysts even predicted "The Great Apple Intelligence iPhone Super Cycle," expecting us to stampede Apple Stores to buy the latest iPhone 16 models just for the new AI tools—despite minimal hardware improvements. ***That never happened***.

///

1
2
3
4
5
6
7
8



Apple's Fifth Avenue store in New York lights up with the new Siri glow, yet most of the new Siri AI features have yet to arrive. PHOTO: MICHAEL NAGLE/BLOOMBERG NEWS

9
10
11

"We see this launch as the start of a multi-year software-driven upgrade cycle," Bank of America wrote in an analyst note around the time of the iPhone 16 announcement in September. But Apple reported that iPhone sales in the quarter ended in December were down nearly 1% from the prior year.

12

\*\*\*

13
14
15

Apple promised the new Siri and Apple Intelligence to those with iPhone 15 Pro and iPhone 16 models. Many of the features, including Writing Tools, Image Playground and notification summaries, rolled out in late 2024, with mixed results. The company never showed off the advanced Siri capabilities—including the ability for the assistant to take actions in apps and understand what's on the screen—after the June keynote presentation.

16

\*\*\*

17
18
19
20
21

"This is a big lift," Craig Federighi, Apple's senior vice president of software engineering, admitted when I asked about Siri's progress in an October interview. "You could put something out there and have it be sort of a mess. Apple's point of view is more like, 'Let's try to get each piece right and release it when it's ready.'" As a longtime product reviewer, I agree. I don't want to test something that clearly isn't ready. But when you overhype and underdeliver—and in Apple's case, attempt to convince us these enhancements justify an expensive phone upgrade—we're left wondering: ***Why should we buy your next shiny thing? Where's that trust?***

22
23

56.    On this news, Apple's stock price fell $14.79 per share, or 7.28%, to close at $188.13 per share on April 4, 2025.

24
25
26
27

57.    Finally, on June 9, Apple hosted the 2025 WWDC, almost one year to the day after first announcing the suite of supposedly forthcoming Apple Intelligence features at the 2024 WWDC. Conspicuously, the Company failed to announce any new updates regarding advanced Siri features.

28    ///

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

58.     Analysts and media outlets variously described the WWDC as "underwhelming" and "disappointing." For example, in an article entitled "The biggest updates Apple just announced for the iPhone, Apple Watch and other major products," CNN stated, in relevant part:

> Apple just showed how it plans to incorporate artificial intelligence across all its major products, from translating phone calls to giving the Mac a smarter search bar and more.
>
> ***The updates aren't as splashy as announcements from the past two years, which heralded big changes with the [] introduction of Apple Vision Pro and Apple Intelligence AI***. But they still gave consumers and Wall Street a clearer picture of how Apple's AI ambitions will impact its products as the company's biggest rivals barrel ahead in the AI race.
>
> ***
>
> The more modest improvements introduced at this year's WWDC suggest that Apple may been aiming for something it was certain it could deliver on this time around. It also shows that rather than trying to create one, killer AI app — the company says its delayed, AI-enhanced Siri is still in the works — the iPhone maker wants Apple Intelligence to make all the tools its users interact with a bit smarter and more useful.
>
> ***But it's unlikely that any of the announcements made at Monday's event will change the perception that Apple is behind its competitors in AI***. Many of the updates have already been available on Android phones from Google and Samsung for quite some time.
>
> ***The event comes at a time when Apple badly needed a win. Steep AI competition aside, the company is still having a rough year, with ongoing slow iPhone sales growth and a trade war threatening to force the company to raise prices***.

59.     Following the 2025 WWDC, Apple's stock price fell another $2.47 per share, or 1.21%, to close at $201.45 per share on June 9, 2025.

60.     Apple's own team has admitted that the advanced AI-based Siri features that it had advertised as reasons to purchase iPhone 16 Devices had not been developed by the time of the 2024 WWDC, or at any other time. At an all-hands meeting for the Siri division following the announcement of the delays, Robby Walker, senior director responsible for Siri, stated that Apple had publicly promoted the technology "before it was ready." Walker called the delays to the key features "ugly and embarrassing" and stated, "[t]his was not one of these situations where we get to show people our plan after it's done. We showed people before." He also noted that "to make matters worse," Apple's marketing communications department wanted to promote the enhancements, and, despite not being ready, they were included in a series of marketing campaigns

and TV commercials. Apple touted the features as a "key selling point" of the iPhone 16 line, which otherwise lacked major changes.

61.    In an article entitled "Apple Delays Siri Upgrade Indefinitely as AI Concerns Escalate," Bloomberg stated that Apple has pushed the expected release of these features until at least the next full version of iOS, iOS 19, which is not expected to be released until September 2025 at the earliest. Moreover, while Apple is aiming to include these features in iOS 19, Walker has stated that that "doesn't mean that we're shipping then," and Apple has "other commitments across Apple to other projects." In fact, there is no guarantee that the advanced AI-based Siri features Apple promised will ever be available. Indeed, Apple's software chief Craig Federighi and other Apple executives have "voiced strong concerns internally that the features didn't work properly—or as advertised—in their personal testing," and some within Apple's AI division "believe that work on the features could be scrapped altogether, and that Apple may have to rebuild the functions from scratch."

## SHARE REPURCHASES

62.    According to the Company's SEC filings, the Director Defendants authorized (i) a share repurchase program for the Company to repurchase up to $90 billion of its common stock in May 2023; (ii) a repurchase program for the Company to repurchase up to $110 billion of its common stock in May 2024; and (iii) an additional program to repurchase $100 billion of the Company's common stock. While the Company's share price was artificially inflated as a result of the misconduct alleged herein, the Individual Defendants caused the Company to repurchase its own common stock, causing harm to the Company, as follows:

| Date | Number of Shares Repurchased | Average Price per Share ($) | Total Paid ($) | Total Overpayment ($)[2] |
|------|------------------------------|-----------------------------|----------------|--------------------------|
| June 2024 | 41,354 | 205.54 | 8,499,901.16 | 169,137.86 |
| July 2024 | 35,697 | 224.11 | 8,000,054.67 | 808,894.02 |
| August 2024 | 42,910 | 221.39 | 9,499,844.90 | 855,625.40 |

---

[2]    "Total Overpayment" refers to the amount the Company overpaid for its common stock and is calculated by subtracting what the Company should have paid for its stock at its true price of $201.45 per share, as it was when the truth was fully revealed, from what the Company actually paid for its common stock at artificially inflated prices, *i.e.*, the "Total Paid ($)".

| Date | Number of Shares Repurchased | Average Price per Share ($) | Total Paid ($) | Total Overpayment ($)[2] |
|---|---|---|---|---|
| September 2024 | 33,653 | 222.86 | 7,499,907.58 | 720,510.73 |
| October 2024 | 41,627 | 229.51 | 9,553,812.77 | 1,168,053.62 |
| November 2024 | 32,784 | 227.13 | 7,446,229.92 | 841,893.12 |
| December 2024 | 25,379 | 248.05 | 6,295,260.95 | 1,182,661.40 |
| January 2025 | 36,809 | 235.43 | 8,665,942.87 | 1,250,769.82 |
| February 2025 | 31,856 | 238.07 | 7,583,957.92 | 1,166,566.72 |
| March 2025 | 39,455 | 221.77 | 8,749,935.35 | 801,725.60 |
| TOTAL | | -- | 81,794,848 | 8,965,838 |

63.      The Company's SEC filings only reveal share repurchases up until March 2025, pending the publication of the Company's next quarterly report. Plaintiff believes that the Individual Defendants caused the Company to repurchase its own common stock beyond March 2025. In any event, through the wrongful course of conduct through at least March 2025, the Company had been harmed by the repurchase programs in overpaying for its own common stock by *over $8.9 million during a nine month span*.

64.      These harmful and wasteful actions could not be the product of informed business judgment, nor could they be construed as being in the best interests of the Company. As a result, the Company has suffered substantial harm which was caused by, or otherwise permitted by, each of Defendants, in direct violation of their fiduciary duties owed to the Company.

## **INSIDER TRADING**

65.      Rather than providing the market with correct information, Defendants Cook, Maestri, Parekh, and Levinson (collectively, the "Insider Selling Defendants"), used their knowledge of Apple's material, nonpublic information to sell their personal holdings while the Company's stock was artificially inflated. As officers and directors of Apple, the Insider Selling Defendants were privy to material, nonpublic information about the Company's AI-based features and prospects.

///

///

66.    While in possession of this material, non-public knowledge, Defendant Cook sold 363,747 shares of his personally held Apple stock for proceeds of at least $81.9 million. His sales were timed to maximize profit from Apple's then artificially inflated stock price.

67.    While in possession of this material, non-public knowledge, Defendant Maestri sold 67,977 shares of his personally held Apple stock for proceeds of at least $15.3 million. His sales were timed to maximize profit from Apple's then artificially inflated stock price.

68.    While in possession of this material, non-public knowledge, Defendant Parekh sold 7,319 shares of his personally held Apple stock for proceeds of at least $1.4 million. His sales were timed to maximize profit from Apple's then artificially inflated stock price.

69.    While in possession of this material, non-public knowledge, Defendant Levinson sold 201,516 shares of his personally held Apple stock for proceeds of at least $54.1 million. His sales were timed to maximize profit from Apple's then artificially inflated stock price.

70.    Accordingly, the Insider Selling Defendants collectively sold over $152.7 million worth of Apple stock at artificially inflated prices.

## DAMAGE TO THE COMPANY

**Securities Class Action**

71.    On January 22, 2024, a securities class action complaint was filed in the United States District Court for the Northern District of California against the Company and the Officer Defendants. The complaint alleges violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and SEC Rule 10b-5 in the case captioned: *Tucker v. Apple, Inc., et al.*, Case No. 3:25-cv-05197 (N.D. Cal.) ("Securities Class Action").

72.    As a result of the wrongs complained of herein, the Individual Defendants have subjected the Company to the significant cost of defending itself and certain of the Company's officers.  The Company will continue to incur significant sums in relation to the Securities Class Action and any liability or settlement that results.

///

///

**Unjust Compensation**

73.     At all relevant times, the Company paid lucrative compensation to each of the Individual Defendants. The Company paid the Individual Defendants in connection with their respective roles as officers and/or directors of the Company.

74.     Accordingly, as part of their respective roles, the Individual Defendants were required to, among other things, exercise due care and diligence in the management and administration of the affairs of the Company, act ethically and in compliance with all laws and regulations, maintain adequate internal controls, and conduct business in a fair and transparent manner.  Further, each of the Individual Defendants had additional duties and responsibilities owed to the Company by virtue of their executive, directorial and/or committee roles, as described *supra*, for which they were compensated for.

75.     However, the Individual Defendants failed to carry out their duties adequately or at all, causing harm to the Company, as alleged herein.  Because the Individual Defendants failed to carry out their respective duties, the compensation they received was excessive and undeserved.  As such, the Individual Defendants were unjustly enriched to the detriment of the Company.

**Share Repurchases**

76.     As alleged above, while engaging in and/or permitting the misconduct as alleged above, the Individual Defendants caused the Company to repurchase its own common stock at artificially inflated prices. As a result, the Company overpaid for its common stock by over $8.9 million, thus causing significant harm to the Company.

**Insider Trading**

77.     As alleged above, the Insider Selling Defendants, while in possession of material, non-public information, collectively abused their positions as Company insiders, misappropriated the Company's valuable information, and reaped over $152.7 million in gross proceeds through their unlawful insider trading which the Company is entitled to disgorge.

**Additional Damage to the Company**

78.     As a direct and proximate result of the Individual Defendants' conduct, the Company will lose and expend many millions of dollars.

79.    Such expenditures include, but are not limited to, legal fees and payments associated with the numerous lawsuits and other actions lodged against the Company as a result of the misconduct discussed herein.

80.    In addition, these losses include, but are not limited to, lavish compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

81.    As a direct and proximate result of the Individual Defendants' conduct, the Company has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## CORPORATE GOVERNANCE

82.    Board members are held to the highest standards of honesty and integrity and charged with overseeing the Company's business practices and policies and assuring the integrity of its financial and business records.

83.    The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Apple, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its investors that the Director Defendants were aware posed a risk of serious injury to the Company.

**Business Conduct Policy**

84.    At all relevant times, Apple maintained its Business Conduct Policy which applies to "all full and part-time employees of Apple and … members of Apple's Board of Directors." In a section entitled "Protecting Apple," the Business Conduct Policy provides the following information:

**Accuracy of Business Records and Fraud**

Accurate and honest business records are critical to meeting our legal, financial, and management obligations. You should ensure that all business records and reports, including expense reports, timecards, information related to employee benefits such as the Apple Matching Gifts Program and Employee Purchase Plan, customer information, and technical and product information that appear in any format, including correspondence and public communications, are comprehensive, fair, accurate, timely, and understandable.

Intentional manipulation of Apple business records is a form of fraud. This includes modifying business records or reports in any way, misstating business facts, or omitting critical business information to mislead others, or assisting others in doing so.

**Records Management**

Apple owns all records and information that is created or received in the course of doing Apple's business. Employees are responsible for managing and protecting information and records in accordance with the Records Management Policy. A record is defined as information created, received, and maintained as evidence and as an asset by the Company in pursuit of legal obligations or in the transaction of business, and is identified in the Records Retention Schedule. Records must be maintained in a manner that ensures their accuracy, integrity, and security. Privacy laws may dictate how long information can be retained. At times, Apple will need to retain records and information beyond the normal retention period for legal reasons or audits. If you have records and information that are categorized as under a "legal hold" you should not alter, destroy, or delete them in any way. Legal will notify you of any legal holds you may be subjected to and what is required.

85.    In a section entitled "Individual Accountability," the Business Conduct Policy states, in relevant part:

**Insider Trading**

Never buy or sell Apple securities, including Apple stock, if you are aware of information that has not been publicly announced and that could have a material effect on the value of the securities. It is illegal and against Apple policy to give anyone, including friends and family, tips on when to buy or sell securities when aware of material nonpublic information concerning that security. This applies to decisions to buy or sell Apple stock or the stock of an Apple supplier, manufacturer, vendor, or customer, such as cellular network carriers or other channel partners.

Information is material if it would likely be considered important by an investor who is deciding whether to buy or sell a security, or if the information is likely to have a significant effect on the market price of the security. Both positive and negative information may be considered material. Examples of potential material information include financial results, information about new products or significant features, timing of significant product announcements or new product introductions, news of a pending or proposed acquisition or other corporate transaction, significant changes in sources or availability of supplies, changes in dividend policy, significant product defects or modifications, and significant cybersecurity, or other data protection or privacy incidents.

Short sales, transactions that hedge or offset, or are designed to hedge or offset any decrease in the value of Apple securities and transactions in derivatives of Apple stock, are prohibited at all times, including transactions involving prepaid variable forward contracts, equity swaps, collars, options, warrants, puts, calls, or similar instruments related to shares of Apple stock.

///

**Audit Committee Charter**

86.    At all relevant times, Apple has maintained its Audit and Finance Committee Charter ("Audit Committee Charter") which sets forth the duties and responsibilities of the Audit and Finance Committee (the "Audit Committee").

87.    The Audit Committee Charter provides that the purpose of the Audit Committee is to:

1. Assist the Board in oversight and monitoring of:

   • the Corporation's financial statements and other financial information provided by the Corporation to its shareholders and others;

   • compliance with legal, regulatory and public disclosure requirements;

   • the independent auditors, including their qualifications and independence;

   • the Corporation's systems of internal controls, including the Internal Audit function;

   • treasury and finance matters;

   • enterprise risk management, privacy and data security; and

   • the auditing, accounting, and financial reporting process generally.

2. Prepare the committee report required by the rules of the Securities and Exchange Commission (the "SEC") to be included in the Corporation's annual proxy statement. The Committee does not itself prepare financial statements or perform audits, and its members are not auditors or certifiers of the Corporation's financial statements. It is not the duty of the Committee to conduct audits or to determine that the Corporation's financial statements and disclosures are complete and accurate and are in accordance with U.S. Generally Accepted Accounting Principles ("GAAP") and applicable rules and regulations. These duties are the responsibilities of management and the independent auditors.

88.    The Audit Committee Charter also sets forth the following duties and responsibilities:

**Financial Reporting**

[]. Review with management and the independent auditor:

   • the Corporation's annual audited financial statements, and related footnotes, and quarterly unaudited financial statements, including the disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations," prior to filing the Corporation's Annual Report on Form 10-K and Quarterly Reports on Form 10-Q, respectively, with the SEC;

   • the independent auditors' audit of the annual financial statements and their report thereon;

• the accompanying management letter and any reports with respect to interim periods;

• any material changes to the Corporation's accounting principles and practices used in preparing financial statements to be filed with the SEC;

• any significant changes required in the independent auditors' audit plan;

• other matters related to the conduct of the audit that are to be communicated to the Committee under the auditing standards of the Public Company Accounting Oversight Board.

[]. Review with management, the independent auditors, and the Corporation's counsel, as appropriate, any legal and regulatory matters that may have a material impact on the financial statements, related compliance policies, and programs and reports received from regulators.

[]. Review and discuss earnings press releases, including the use of non-GAAP financial measures, prior to public disclosure.

[]. Provide a report for inclusion in the Corporation's proxy statement in accordance with the rules and regulations of the SEC.

[]. Oversee compliance with the requirements of the SEC for disclosure of auditors' services and audit committee member qualifications and activities.

[]. Discuss with the independent auditors the financial statements and audit findings, including any significant adjustments, management judgments and accounting estimates, significant new accounting policies and any other matters required to be discussed by the applicable requirements of the Public Company Accounting Oversight Board and the SEC, as in effect at the time in the case of annual statements, and Auditing Standard 4105, as in effect at the time in the case of quarterly statements. Internal Control Over Financial Reporting and Disclosure Controls and Procedures

[]. Review the adequacy of the Corporation's internal control over financial reporting and the disclosure controls and procedures designed to ensure compliance with applicable laws and regulations.

[]. Consider and review with the independent auditor and the head of Internal Audit the adequacy of the Corporation's internal controls and any related significant findings and recommendations of the independent auditor and internal auditors together with management's responses thereto.

[]. Periodically review with management any significant deficiencies or material weaknesses in the design or operation of internal control over financial reporting, any fraud involving any employees who have a significant role in the Corporation's internal control over financial reporting, and any significant changes in internal control over financial reporting or in other factors that could significantly affect internal control over financial reporting, including management's responses thereto.

///

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

[]. Establish procedures for receiving, retaining and treating complaints received by the Corporation regarding accounting, internal accounting controls, or auditing matters and procedures for the confidential, anonymous submission by employees of concerns regarding questionable accounting or auditing matters.

\*\*\*

**Risk Oversight, Privacy and Data Security**

[]. Review and discuss with management:

- management's program to identify, assess, manage, and monitor significant business risks of the Corporation, including financial, operational, privacy, data security, business continuity, tax, legal and regulatory compliance, and reputational risks; and

- management's risk management decisions, practices, and activities.

[]. Review and discuss with management the Corporation's privacy and data security risk exposures, including:

- the potential impact of those exposures on the Corporation's business, financial results, operations and reputation;

- the steps management has taken to monitor and mitigate such exposures;

- the Corporation's information governance policies and programs; and

- major legislative and regulatory developments that could materially impact the Corporation's privacy and data security risk exposure.

[]. Regularly report to the Board the substance of such reviews and discussions and, as necessary, recommend to the Board such actions as the Committee deems appropriate.

## DUTIES OF THE DIRECTOR DEFENDANTS

89.    As members of The Company's Board, the Director Defendants were held to the highest standards of honesty and integrity and charged with overseeing the Company's business practices and policies, and assuring the integrity of its financial and business records.

90.    The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its investors that the Director Defendants were aware posed a risk of serious injury to the Company

91.    By reason of their positions as officers and/or directors of the Company, and because of their ability to control the business and corporate affairs of the Company, the Director Defendants owed the Company and its investors the fiduciary obligations of trust, loyalty, and

good faith.  The obligations required the Director Defendants to use their utmost abilities to control and manage the Company in an honest and lawful manner.  The Director Defendants were and are required to act in furtherance of the best interests of the Company and its investors.

92.    Each director of the Company owes to the Company and its investors the fiduciary duty to exercise loyalty, good faith, and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets.  In addition, as officers and/or directors of a publicly held company, the Director Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, finances, and financial condition, as well as present and future business prospects, so that the market price of the Company's stock would be based on truthful and accurate information.

93.    To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the affairs of the Company.  By virtue of such duties, the officers and directors of the Company were required to, among other things:

(a)    ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(b)    conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(d)    remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, take steps to correct such conditions or

practices, and make such disclosures as necessary to comply with federal and state securities laws;

    (e)    ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state and local laws, and rules and regulations; and

    (f)    ensure that all decisions were the product of independent business judgment and not the result of outside influences or entrenchment motives.

94.    Each Director Defendant, by virtue of his position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Director Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

95.    The Director Defendants breached their duties of loyalty and good faith by causing the Company to issue false and misleading statements concerning the financial condition of the Company. As a result, the Company has expended, and will continue to expend, significant sums of money related to investigations and lawsuits and to structure settlements to resolve them.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

96.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of Defendants' breaches of fiduciary duties, gross mismanagement, and other wrongful conduct as alleged herein.

97.    Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights and has retained counsel competent and experienced in derivative litigation.

///

98.     Plaintiff is a current owner of the Company's common stock and has continuously been an owner of the Company's stock during all times relevant to the Director Defendants' wrongful course of conduct alleged herein. Plaintiff understands his obligation to hold stock throughout the duration of this action and is prepared to do so.

99.     Because of the facts set forth herein, Plaintiff has not made a demand on the Board to institute this action against Defendants.  Such a demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

100.    At the time this suit was filed, the Company's Board was comprised of eight (8) members including Defendants Cook, Levinson, Austin, Gorsky, Jung, Lozano, Sugar, Wagner Thus, Plaintiff is required to show that a majority of the Director Defendants, *i.e.*, four (4), cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.

101.    Each of the Director Defendants face a likelihood of liability in this action because they caused and/or permitted the Company to make false and misleading statements and omissions concerning the information described herein. Because of their advisory, managerial, and directorial positions within the Company, the Director Defendants had knowledge of material, non-public information regarding the Company and were directly involved in the operations of the Company at the highest levels.

102.    The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

103.    The Director Defendants (or at the very least a majority of them) cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.  For the reasons that follow, and for reasons detailed elsewhere in this complaint, Plaintiffs have not made (and should be excused from making) a pre-filing demand on the Board to initiate this action because making a demand would be a futile and useless act.

///

104.    Each of the Director Defendants, by virtue of their roles, were required to, among other things: (i) ensure that the Company complied with its legal and regulatory obligations and requirements; (ii) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time; (iii) remain informed as to how the Company conducted its operations, make reasonable inquiries, and take steps to correct any improper conditions or practices; and (iv) ensure the Company was operated in a diligent, honest, and prudent manner.  Despite this, the Director Defendants failed to fulfil these duties by permitting the false and misleading statements to be made and not correcting those statements.

105.    As trusted Company directors, the Director Defendants conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded their duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded their duties to protect corporate assets.

106.    Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

107.    Each of the Director Defendants reviewed, authorized, signed, and thus personally made and/or otherwise permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

108.    Additionally, each of the Director Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

109.    Further, the Director Defendants authorized the harmful share repurchase program and caused the Company to repurchase its own common stock at artificially inflated prices, thereby causing the Company to overpay for its own stock. As such, the Director Defendants face a substantial likelihood of liability therefor and are incapable of independently considering a demand

1    in the best interests of the Company.

2        110.    Despite having knowledge of the history of their own misconduct and

3    mismanagement, the Director Defendants have failed to seek recovery for the Company for any of

4    the misconduct alleged herein.

5

6                    **DEMAND IS FUTILE BECAUSE**

7            **DEFENDANT COOK CONTROLS THE BOARD**

8        111.    Furthermore, The Director Defendants each lack independence from and are all

9    beholden to Defendant Cook, who holds immense power at the Company and directly oversees all

10   aspects of the Company's operations and strategy.

11       112.    Defendant Cook is known for wielding this power in the selection of Board

12   members. It has been reported that Defendant Cook can effectively "handpick" his fellow

13   directors.[3]

14       113.    Demand on the Director Defendants is futile because the Company's CEO and only

15   employee-director, Defendant Cook, wields such overwhelming influence and control within the

16   Company that these purportedly independent directors are neither disinterested nor capable of

17   exercising independent business judgment with respect to the claims asserted herein. Defendant

18   Cook has served as the Company's chief executive for fourteen years, was handpicked by former

19   CEO Steve Jobs as his successor, and has cultivated a level of authority and deference that renders

20   the Board effectively subservient to his wishes. His control over strategic direction, executive

21   appointments, compensation decisions, and major operational policies is effectively absolute.

22       114.    The Director Defendants lack the autonomy required to fairly assess a demand for

23   litigation against Defendant Cook, given that each was effectively handpicked or approved by him.

24   These directors owe their board seats, continued tenure, and substantial compensation to

25   Defendant Cook and have no meaningful track record of challenging his decisions or asserting

26   independent oversight. Defendants Levinson, Sugar, and Jung are all especially longstanding

27   directors having been on the Board when Defendant Cook was appointed as CEO, they were

28   _____

[3]    *See* Eleanor Bloxham, *Apple's board reboot: Tim Cook needs to stay out*, Fortune (July 9, 2014), available at https://fortune.com/2014/07/09/apple-tim-cook-board-succession/.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

instrumental in appointing Defendant Cook as CEO, and in turn Defendant Cook has had them remain on the Board since. Accordingly, any demand on the Board would be a futile and useless act, as the Director Defendants are incapable of evaluating it with the requisite disinterest and independence under the applicable standards.

## THE DIRECTOR DEFENDANTS ARE
## NOT INDEPENDENT OR DISINTERESTED

**Defendant Cook**

115.    Defendant Cook is neither disinterested nor independent and is thus incapable of considering a demand to sue because he (as its CEO) is an employee of the Company who derives substantially all of his income from his employment with the Company, making him not independent. As such, Defendant Cook cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would expose him to liability and threaten his livelihood.

116.    As CEO, Defendant Cook also fails the Nasdaq bright-line independence test as set forth in Nasdaq Listing Rule 5605(a)(2) and cannot, therefore, be considered independent, as admitted by the Company in its 2025 Proxy Statement. As such, Defendant Cook could not objectively and disinterestedly consider a demand to sue the Individual Defendants and any demand upon Defendant Cook is therefore futile.

117.    Defendant Cook also personally reviewed, signed, authorized, and/or made the false and misleading statements alleged herein during earnings calls, in SEC filings, press releases, and in other public forums. Thus, as a main perpetrator of the wrongdoing alleged herein, Defendant Cook is irreconcilably conflicted, faces a substantial likelihood of liability, and cannot consider a demand to sue.

118.    In addition, Defendant Cook receives lucrative compensation in connection with his employment with the Company. Defendant Cook is not independent from Defendants Gorsky, Jung, and Levinson as they comprise the People and Compensation Committee ("Compensation Committee") and are responsible for evaluating and determining the compensation of the CEO and

Executive Officers, including Defendant Cook. The purpose of the Compensation Committee is to assist the Board in discharging its responsibilities related to the compensation provided by the Company to its CEO and Executive Officers. Because of his status as an inside director, and the concomitant substantial compensation he receives, Defendant Cook could not consider a demand adverse to the other Director Defendants serving on the Compensation Committee who are responsible for his financial future.

119. Because of Defendant Cook's participation in the gross dereliction of fiduciary duties, and breaches of the duties of due care, good faith, and loyalty, Defendant Cook is unable to comply with his fiduciary duties and prosecute this action. Defendant Cook is in a position of irreconcilable conflict of interest in terms of the prosecution of this action and defending himself in the Securities Class Action.

**Defendant Levinson**

120. As described above, Defendant Levinson has been Chairman of the Board since 2011 and a director since 2000.

121. Defendant Levinson and Defendant Cook have a close relationship built upon mutual respect. In 2011, the same year the Board selected Cook to serve as the Company's CEO, Defendant Levinson became Chairman. Levinson had been a close friend of Apple's former Chairman and CEO Steve Jobs and replaced Jobs as Chairman upon Jobs' death.[4] Only a few months previously, the Board had elevated Cook to the position of CEO after years of close mentorship under Jobs, who handpicked Cook to join Apple and spent years preparing Cook for leadership, with Levinson remaining as Chairman.

122. Levinson and Cook have frequently praised each other during their overlapping tenures. Defendant Levinson has stated that Cook has the Board's "wholehearted support and admiration." When Defendant Levinson was named Chairman of the Board in 2011, Cook stated that Levinson "has made enormous contributions to Apple since he joined the board in 2000" and that Levinson "has been our longest serving co-lead director, and his insight and leadership are incredibly valuable to Apple, our employees and our shareholders."[5]

---

[4]   https://moneyinc.com/arthur-levinson/
[5]   "Apple Names Arthur D. Levinson Chairman of the Board." Apple, Inc., November 11,

**Defendant Sugar**

123.    Defendant Sugar has been a director since 2010, even before Cook joined the Board. Defendant Sugar has served as the Chair of the Audit Committee since 2010.

124.    Defendant Sugar has also recently been extended a unique opportunity by the Board to continue serving as a director even beyond the general Apple policy that directors may not stand for re-election after attaining age 75. In its 2025 Proxy Statement, the Board stated as follows:

> [T]he Board determined that it would be in the best interests of Apple and its shareholders to ask Ron Sugar, the Chair of the Audit Committee, to stand for re-election at the 2025 Annual Meeting, although he previously attained the age of 75. As Chair of the Audit Committee, Dr. Sugar has a significant technical and leadership role on the Board, which the Board took into consideration in its succession planning.

125.    Evidently, Defendant Sugar has been deemed to be so deeply entrenched and influential to the Company that the Board took the extraordinary step of recommending that he stand for re-election despite the general retirement policy of having Board directors retire upon reaching 75 years of age.

126.    Accordingly, because of this, Defendant Sugar lacks sufficient independence and is incapable of impartially considering a demand to commence and vigorously prosecute this action.

**The Insider Selling Directors**

127.    As alleged above, Defendants Cook and Levinson (the "Insider Selling Directors") each sold copious amounts of their personally held common stock while in possession of material, non-public information regarding the Company's AI-based features and prospects.  Each of the Insider Selling Directors' sales were timed to maximize profit from the Company's artificially inflated stock price. Accordingly, each of the Insider Selling Directors face a substantial likelihood of liability for their unlawful insider trading, and further obtained a material personal benefit from their insider trading.

128.    Because each of the Insider Selling Directors face a substantial likelihood of liability and reaped a material personal benefit from their unlawful insider trading, none of them

2011, Press Release.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

can reasonably consider a demand to sue each other. Nor could the Insider Selling Directors reasonably investigate the insider sales committed by Defendants Maestri and Parekh without bringing attention to their own unlawful insider sales. As such, demand is excused as to each of the Insider Selling Directors.

**Defendants Austin, Lozano, Sugar, Wagner**

129.    Defendants Austin, Lozano, Sugar, and Wagner as members of the Audit Committee, reviewed and approved the improper statements. The Audit Committee's Charter provides that it is responsible for compliance with accounting, legal, and regulatory requirements. Thus, Defendants Austin, Lozano, Sugar, and Wagner were responsible for knowingly or recklessly allowing the improper statements related to the Company's earnings guidance and financial and disclosure controls.

130.    Moreover, Defendants Austin, Lozano, Sugar, and Wagner reviewed and approved the improper press releases made to the public. Despite their knowledge or reckless disregard, Defendants Austin, Lozano, Sugar, and Wagner caused these improper statements. Accordingly, Defendants Austin, Lozano, Sugar, and Wagner breached their fiduciary duty of loyalty because they participated in the wrongdoing described herein. Thus, Defendants Austin, Lozano, Sugar, and Wagner face a substantial likelihood of liability for their breach of fiduciary duties so any demand upon them is futile.

**Additional Reasons Demand is Futile**

131.    The Company has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director Defendants have not caused the Company to take action to recover for the Company the damages it has suffered and will continue to suffer thereby.

132.    The Company, at all material times, had its Business Conduct Policy and related corporate governance policies which required each of the Individual Defendants to maintain the highest standards of honesty and integrity, particularly in relation to accurate and truthful public disclosures. Yet, despite this Business Conduct Policy and other relevant policies and committee charters, each of the Director Defendants failed to ensure that the Company upheld high standards

of integrity, misrepresented facts to the investing public, and failed to report any concerns, or investigate any misconduct, let alone commence litigation against the Individual Defendants.

133.   In violation of the Business Conduct Policy, the Director Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to cause the Company to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, waste of corporate assets, and unjust enrichment. In violation of the Business Conduct Policy, the Director Defendants failed to comply with laws and regulations, failed to maintain the accuracy of company records, public reports, and communications, and failed to uphold the responsibilities related thereto. Thus, the Director Defendants face a substantial likelihood of liability and demand is futile as to them.

134.   The Director Defendants received, and continue to receive, substantial salaries, bonuses, payments, benefits, and other emoluments by virtue of their membership on the Board. They have benefitted from the wrongs alleged herein and have engaged therein to preserve their positions of control and the prerequisites thereof and are incapable of exercising independent objective judgment in deciding whether to bring this action.

135.   The Director Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company.  Accordingly, demand is excused as being futile.

136.   Publicly traded companies, such as Apple, typically carry director and officer liability insurance from which the Company could potentially recover some or all of its losses. However, such insurance typically contains an "insured vs. insured" disclaimer that will foreclose a recovery from the insurers if the Individual Defendants sue each other to recover the Company's

damages. If no such insurance is carried, then the Director Defendants will not cause the Company to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability.  Accordingly, demand is futile in that event.

137.    Accordingly, each of the Current Directors, and at least a majority of them, cannot reasonably consider a demand with the requisite disinterestedness and independence. Indeed, any demand upon the Current Directors is futile and, thus, excused.

## CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION

#### (Against the Individual Defendants for Breach of Fiduciary Duties)

138.    Plaintiff incorporates by reference and re-allege each and every allegation contained above, as though fully set forth herein.

139.    The Individual Defendants owe the Company fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants owed and owe the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

140.    The Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

141.    The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties.  Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by failing to disclose that: (i) Apple misstated the time it would take to integrate the advanced AI-based Siri features into its devices; (ii) accordingly, it was highly unlikely that these features would be available for the iPhone 16; (iii) the lack of such advanced AI-based features would hurt iPhone 16 sales; (iv) as a result, Apple's business and/or financial prospects were overstated; and (v) as a result, the Company's public statements were materially false and misleading at all relevant times.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

///

142.    As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, the Company has sustained significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

143.    As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill.  Such damage includes, among other things, costs associated with defending securities lawsuits, severe damage to the share price of the Company, resulting in an increased cost of capital, the waste of corporate assets, and reputational harm.

## SECOND CAUSE OF ACTION

### (Against the Individual Defendants for Gross Mismanagement)

144.    Plaintiff incorporates by reference and re-allege each allegation contained above, as though fully set forth herein.

145.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of the Company in a manner consistent with the operations of a publicly held corporation.

146.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, the Company has sustained significant damages in excess of hundreds of millions of dollars.

147.    Because of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

## THIRD CAUSE OF ACTION

### (Against the Individual Defendants for Waste of Corporate Assets)

148.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

///

///

149.     The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going.  It resulted in continuous, connected, and ongoing harm to the Company.

150.     As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, *inter alia*: (i) paying excessive compensation and bonuses to certain of its executive officers; (ii) awarding self-interested stock options to certain officers and directors; (iii) incurring potentially millions of dollars of legal liability and/or legal costs to defend the Officer Defendants' unlawful actions; and (iv) causing and/or permitting the Company to repurchase its own common stock at artificially inflated prices.

151.     As a result of the waste of corporate assets, the Director Defendants are liable to the Company.

**FOURTH CAUSE OF ACTION**

**(Against the Individual Defendants for Unjust Enrichment)**

152.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

153.     By their wrongful acts, violations of law, and inaccurate and untruthful information and/or omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and the detriment of, the Company.

154.     The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from the Company that was tied to the performance of the Company or its stock price or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

///

155.     Plaintiff, as a shareholder and representative of the Company seeks restitution from Defendants and seek an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including any

1    performance-based or valuation-based compensation, obtained by the Individual Defendants due

2    to their wrongful conduct and breach of their fiduciary and contractual duties.

3

4                                    **FIFTH CAUSE OF ACTION**

5                    **(Against the Director Defendants for Aiding and Abetting)**

6        156.    Plaintiff incorporates by reference and realleges each and every allegation set forth

7    above, as though fully set forth herein.

8        157.    The Director Defendants exploited, aided and abetted, and were knowing and

9    culpable participants to the breaches of fiduciary duty by the Officer Defendants. Likewise, the

10   Officer Defendants exploited, aided and abetted, and were knowing and culpable participants to

11   the breaches of fiduciary duty by the Director Defendants.

12       158.    Specifically, the Director Defendants, in violation of the Company's corporate

13   governance, engaged in and/or permitted the Company to engage in the scheme to issue materially

14   false and misleading statements to the public, including in the Company's SEC filings, and by

15   facilitating and disguising the Officer Defendants' violations of law as alleged herein, and failing

16   to report the same.

17       159.    As a result, the Director Defendants substantially assisted the Officer Defendants

18   in breaching their fiduciary duties and in committing the other wrongful and unlawful conduct as

19   alleged herein.

20       160.    As a direct and proximate result of the aiding and abetting the breaches of fiduciary

21   duty alleged herein, the Company has sustained and will continue to sustain significant damages.

22       161.    As a result of the misconduct alleged herein, the Director Defendants are liable to

23   the Company.

24                                    **SIXTH CAUSE OF ACTION**

25                    **(Against the Insider Selling Defendants for Insider Trading)**

26       162.    Plaintiff incorporates by reference and realleges each and every allegation set forth

27   above, as though fully set forth herein.

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

163.    By reason of their fiduciary role as officers and directors of the Company, the Insider Selling Defendants specifically owed the Company the highest obligation of due care, good faith, and loyalty.

164.    As directors and/or officers of the Company, the Insider Selling Defendants were given access to material information about the Company, as described above, which was not generally available to the public.

165.    When the Insider Selling Defendants sold their Company stock, as detailed *supra*, they were in possession of material, non-public information described above and sold Company stock on the basis of such information for collective gross proceeds in excess of $152.7 million.

166.    The information described above was proprietary, non-public information concerning the Company's business operations and financial condition.  It was a proprietary asset belonging to the Company, which the Insider Selling Defendants misappropriated to their own benefit when they sold holdings in Company stock.  The Insider Selling Defendants knew that this information was not intended to be available to the public. Had such information been generally available to the public, it would have significantly reduced the market price of Company stock.

167.    As the use of the Company's proprietary information for their own gain constitutes a breach of the Insider Selling Defendants' fiduciary duties, the Company is entitled to disgorge any illegal profits obtained thereby.

## SEVENTH CAUSE OF ACTION

### (Against the Individual Defendants for Violations of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 Promulgated Thereunder)

168.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

169.    The Individual Defendants disseminated and/or approved public statements that failed to disclose that the above-referenced truthful facts and as a result of the foregoing, the Individual Defendants' public statements were materially false and misleading at all relevant times.  Thus, the price of the Company's shares was artificially inflated due to the deception of the

Individual Defendants.  Despite this artificial inflation in the price of the Company's shares, the Individual Defendants caused and/or allowed the Company to repurchase many millions of shares of Company stock, thereby causing significant financial harm to the Company.

170.    As alleged herein, the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Apple, their control over, and/or receipt and/or modification of Apple's allegedly materially misleading statements and/or their associations with the Company which made them privy to confidential proprietary information concerning Apple, participated in the fraudulent scheme alleged herein.

171.    The Individual Defendants knew and/or recklessly disregarded the false and misleading nature of the information which they caused to be disseminated to the investing public. The fraudulent scheme described herein could not have been perpetrated without the knowledge and complicity or, at least, the reckless disregard of the personnel at the highest levels of the Company, including the Individual Defendants.

172.    The Individual Defendants were each members of Apple's Board of Directors and senior management team during the aforesaid time period.  Based on their roles at Apple, each of the Individual Defendants would have been involved with, or knowledgeable about, the wrongdoing alleged herein.

173.    At a minimum, the Individual Defendants failed to review or check information that they had a duty to monitor or ignored obvious signs that their statements were materially false and misleading or contained material omissions.  Given the nature and extent of the problems at Apple, the Individual Defendants knew and/or recklessly disregarded the extent and scope of their statements.

///

174.    Likewise, the Individual Defendants, by virtue of their high-level positions with the Company, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels and were privy to confidential proprietary information concerning the Company and its business, operations, financial statements, and financial condition, as alleged herein.  The Individual Defendants had the ultimate authority over and were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements regarding the Company were being issued, and approved or ratified these statements, in violation of the federal securities laws.

175.    As such the Individual Defendants caused the Company to violate section 10(b) of the Exchange Act and SEC Rule 10b-5 in that they: (i) employed devices, schemes, and artifices to defraud; and (ii)  made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

176.    As a result of the wrongful conduct as alleged herein, the Individual Defendants have violated Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5 promulgated thereunder and are thus liable for any harm caused to the Company.

**EIGHTH CAUSE OF ACTION**

**(Against the Individual Defendants for Violations of**

**California Corporations Code §§ 24400, 25500, *et seq*.)**

177.    Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

178.    Each of the Individual Defendants: (i) approved the Company's stock repurchase program; and/or (ii) approved, authorized and/or effectuated share repurchases by the Company or sold their own personally-held shares of Apple common stock during the same time that the Company was repurchasing its shares, as alleged herein. Pursuant to these authorizations and approvals, Apple repurchased tens of thousands of shares of its common stock in the open market

and from Individual Defendants, directly and indirectly, including at regular market prices, for total purchase prices of at least $152.7 million.

179. In connection with Apple's share repurchases, the Individual Defendants made or caused to be made by or on behalf of Apple false and misleading statements and/or omissions as described above, which the Individual Defendants knew or recklessly disregarded were materially false, misleading and/or incorrect and were intended to deceive or defraud the public (including Plaintiff and Apple's minority shareholders) and to manipulate the market for Apple securities by artificially inflating the market price of shares of Apple common stock. Those false and misleading statements or omissions were made, authorized, or approved by the Individual Defendants intentionally as part of a course of conduct that was intended to, and did, manipulate the market for Apple securities by artificially inflating the price of Apple's common stock.

180. At the same time that the price of Apple's common stock was artificially inflated due to the false and misleading statements or omissions as described above, the Individual Defendants caused Apple to repurchase voluminous amounts of shares of its common stock, including in the open market, at prices that were higher than the prices that Apple would have paid for the shares had the Company's stock price not been artificially inflated due to the false and misleading statements or omissions that the Individual Defendants made or caused to be made by or on behalf of Apple as described above.

181. The Individual Defendants engaged in a scheme that deceived or defrauded Apple by causing the Company to purchase shares of its stock at artificially inflated prices that were higher than the price Apple would have paid for its shares had its stock price not been artificially inflated due to the Individual Defendants' false and misleading statements or omissions as described above.

182. The Individual Defendants violated Corporations Code section 25400 in that they made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and they engaged in acts, practices, and/or a course of business that manipulated the

1  market for Apple stock, and thereby operated as a fraud or deceit upon Apple in connection with

2  its share repurchases.

3          183.    As described above, the Individual Defendants acted with intent to deceive,

4  manipulate, or defraud the market, by issuing materially false and misleading statements and

5  omissions, including in Apple's quarterly and annual reports, and other public filings with the

6  SEC, in press releases and on conference calls with analysts. These contained omissions and

7  misrepresentations that the Individual Defendants knew: (i) were misleading; (ii) failed to disclose

8  material facts and information that was required to be disclosed under applicable laws and

9  regulations, or that the Individual Defendants knew was necessary to make  the Individual

10  Defendants' statements not misleading; and/or (iii) caused Apple's stock price to trade at higher

11  prices than if the omitted facts were disclosed, or if the facts had been disclosed truthfully,

12  including material facts and information related to the Company's business, policies, practices,

13  and internal controls, including relating to its AI-based features.

14          184.    The Individual Defendants' statements were false and misleading because they

15  failed to state or omitted material facts and did not disclose information regarding, among other

16  things:

17          185.    In connection with the share repurchases, the Individual Defendants acted either

18  with intent to deceive, manipulate, or defraud, or with severe recklessness. The Individual

19  Defendants caused Apple to expend corporate funds to repurchase shares of its stock while it was

20  trading at prices that were artificially inflated by the false and misleading statements that the

21  Individual Defendants issued with intent to deceive, manipulate, or defraud, which were made in

22  connection with the purchase or sale of Apple stock, as described above. Apple's repurchases of

23  its shares of its common stock while it was trading at artificially inflated prices were approved

24  and/or authorized by the Individual Defendants for an improper purpose, *i.e.*, to manipulate the

25  market for Apple securities.

26          186.    The Individual Defendants' market manipulation and their acts in connection with

27  the stock repurchases and other wrongful conduct described above violated Corporations Code

28  section 25400.

187. The Individual Defendants were among the senior management and the directors of the Company, and were therefore directly responsible for, and are liable for, the materially false and misleading statements and omissions that artificially inflated Apple's stock price and manipulated the market for Apple securities, and for approving the share repurchase program and/or share repurchase authorization(s) pursuant to which the share repurchases described above were effectuated by or on behalf of Apple.

188. As a result of the Individual Defendants' violations of Corporations Code section 25400, Apple suffered damages in connection with its purchases of shares of Apple stock. By reason of such conduct, the Individual Defendants are liable to Apple for the damages that it sustained as a result of their violations of Corporations Code section 25400, pursuant to Corporations Code section 25500.

189. Pursuant to the provisions of Corporations Code section 25500, Plaintiff, on behalf of Apple, is entitled to rescind the sales of the repurchased shares described above and recover from Individual Defendants the consideration that Apple paid for the shares, plus interest at the legal rate, in amounts to be determined alter discovery which reflect the artificial inflation in Apple's stock price that was due to the false and misleading statements and omissions and other conduct by the Individual Defendants that manipulated the market for Apple securities and caused the Company to repurchase shares of its common stock at higher prices than Apple would have paid for the shares were it not for the Individual Defendants' violations of Corporations Code section 25400 described above.

190. Each of the Individual Defendants, through their positions as officers and/or directors of Apple, directly or indirectly controls persons, including other Individual Defendants who are liable under Corporations Code section 25500 for false and misleading statements as alleged herein, and is also liable jointly and severally with and to the same extent as those persons, pursuant to Corporations Code section 25504.

191. Alternatively, at all times mentioned in this complaint, each of the Individual Defendants, with the intent to deceive or defraud the public (including Plaintiff and Apple's minority shareholders), materially assisted other Individual Defendants in violating section 25400

of the Corporations Code in that they signed, approved, authorized, issued and/or disseminated the false and misleading statements or omissions described above, which the Individual Defendants knew or recklessly disregarded: (i) were materially false and/or incorrect; or (ii) omitted and failed to disclose material facts and information that was required to be disclosed under applicable laws and regulations, or that the Individual Defendants knew was necessary to make the Individual Defendants' statements, in light of circumstances under which they were made, not misleading, which caused Apple's stock price to trade at higher prices than if the omitted facts were disclosed, or if the facts had been disclosed truthfully. As a result, each of the Individual Defendants is jointly and severally liable for the violation of Corporations Code section 25400 described in this complaint, pursuant to Corporations Code section 25504.1

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for relief and judgment as follows:

A.    Awarding, against the Individual Defendants and in favor of the Company, the damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties, gross mismanagement, unjust enrichment, waste of corporate assets, violations of Section 10(b) of the Exchange Act, and violations of the California Corporations Code;

B.    Awarding, against the Director Defendants and in favor of the Company, the damages sustained by the Company as a result of the Director Defendants aiding and abetting;

C.    Awarding, against the Insider Selling Defendants and in favor of the Company, disgorgement of all illicitly gained proceeds from the Insider Selling Defendants' unlawful insider trading;

D.    Directing the Company to take all necessary actions to reform and improve its corporate governance and internal procedures, to comply with the Company's existing governance obligations and all applicable laws and to protect the Company and its investors from a recurrence of the damaging events described herein;

E.    Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1    F.    Granting such other and further relief as the Court deems just and proper.

2    <u>**JURY DEMAND**</u>

3    Plaintiff demands a trial by jury on all issues so triable.

4    Respectfully submitted,

5    CLAYEO C. ARNOLD, APC

6

7    Dated:  June 26, 2025    By: _____

8    M. Anderson Berry
     Attorneys for Plaintiff, individually and
9    on behalf of all others similarly situated

10   Thomas J. McKenna*
     *tjmckenna@gme-law.com*
11   Gregory M. Egleston*
     *gegleston@gme-law.com*
12   **GAINEY McKENNA & EGLESTON**
     260 Madison Avenue, 22nd Floor
13   New York, NY 10016
     Tel.: (212) 983-1300
14   Fax: (212) 983-0383

15   *Pro Hac Vice Forthcoming*

16

17

18

19

20

21

22

23

24

25

26

27

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT